Charles F. Claiborne,
      Judge.

CHARLES BAKER

   VS

BELLE-CHASSE LAND CO.

 No. 7832

November 8th, 1920.

CHARLES BAKER

VS                                    No. 7832

BELLE-CHASSE LAND CO.

Appeal from Civil District Court, Hon. Fred D. King, Judge.

CHARLES F. CLAIBORNE, JUDGE.

This is a damage suit for an alleged conversion of property. The facts are as follows:

On June 28th, 1917, the defendant company sold to Goldstein a lot of scrap iron or junk lying on its plantation in Plaquemine Parish, for the price of $200 cash. On July 23d, 1917, Goldstein sold the same to Richmond for a price apparently of $195. Richmond sold 18 tons of this junk a short time after for $19 a ton, and on September 18th, 1917, he testified he sold the remainder to Baker for $350. On December 27th, 1917, the defendant sold the same junk for $165 to one Willcom, who in turn sold to Glaser for $225.

The plaintiff filed this suit in February 1918; he alleged that the defendant had no right to sell this junk to Willcom; that it was his property, having previously purchased the same from Richmond, as defendant well knew; that the junk consisted of cut boilers and drums, sugar tanks, smoke stacks, one fly wheel, cog wheels and one steel shaft, weighing in all seventy tons; "that at the time of said purchase he had an opportunity to sell said property at a sale price of $24.50 per ton"; and he prayed for judgment for 70 times $24.50, or $1715.00.

Defendant denied any indebtedness to plaintiff; denied that the junk consisted of the items enumerated above, or that it weighed seventy tons, denied that it had the value placed upon it by the plaintiff; and denied that they knew that he had purchased from Richmond. Further answering defendant averred:

"That on June 28th, 1917, it sold to Max Richmond and M. Goldstein the scattered scrap iron on its plantation in Plaquemines Parish for the sum of $200.00, with

33

the understanding and on the condition that same should be removed within sixty days and that after the expiration of sixty days said vendee would have no right, title, or interest therein; and that a few days before the expiration of said term defendant agreed to an extension of the term for removal, for sixty days additional; that within the said extended term of removal and about forty days before the expiration thereof said Max Richmond came to defendant's secretary and represented that he had an opportunity to sell the scrap iron, but could not do so without a written statement showing same had been paid for; that in order to accommodate said Richmond defendant's secretary gave him the statement referred to in Article V of plaintiff's petition, which reads as follows:

"September 18th, 1917.

To whom it may concern:
This is to certify that we have received from Max Richmond full payment for scrap iron sold to M. Goldstein and Max Richmond".

"Signed" Belle-Chasse Land, Co., Ltd.

B.S. Braswell, Secy-Treas."

"that about the same time, plaintiff came to defendant's office and represented to its secretary that he was contemplating the purchase of said scrap iron and asked for verification of the representations of said Richmond that he had the right to sell same, and inquired about the aforesaid conditions of removal, that defendant explained to plaintiff the contract with said Richmond, the conditions with reference to removal, and the extension of the term, and discussed with plaintiff the approaching expiration of the extended term for removal; and that if plaintiff acquired from said Richmond any interest in said scrap iron in good faith, which is denied, he acquired such interest with full knowledge of the limitation of Richmond's rights, and especially with full knowledge of the approaching expiration of the extended term for removal, and that he acquired no greater rights than said Richmond

34

had; that plaintiff made no effort to remove the scrap
iron within the term of removal; that defendant never
heard anything further from him, and never knew whether
he had bought the scrap iron or not, and that in order
to get the scrap iron off of the place and out of the
way, defendant, on the 27th day of December, sold the
scrap iron to another party under the same conditions for
$165, and granted a term of thirty days for its removal;
that within the term of thirty days said last party remov-
ed part of the iron, abandoning his right to the remainder
which is still on the place, and in the way and interfer-
ing with defendant's efforts to clean it up".

There was judgment for plaintiff for $715.

In its reasons for judgment the Court said that Richmond
had purchased from the defendant; that he had afterwards sold to
plaintiff; that plaintiff acted upon the faith of the letter of
the defendant dated September 18th, 1917 copied hereinabove; that
the defendant had no right to sell to Wilkom without notice to
Baker; that there were no less than 65 tons of junk; that Wilkon
sold a part of the junk at $11 a ton, which fixed its value for
the whole at $715.

From this judgment the defendant has appealed.

On behalf of the defendant, B. S. Braswell, its Secretary-
Treasurer, testified that the scrap iron on Belle-Chasse was sold
to Richmond and Goldstein for $200,

"giving them 60 days within which to remove it , and if
not removed to revert to the Company.  Before those 60
days had expired Mr.Richmond came to me and he said that
he wanted more time; that he had trouble in getting labor;
he wanted more time within which to remove it from the
place, and we granted him 60 days more time. x x  Before
those 60 days had expired Mr. Richmond told me that he
had been drafted into the army, and that he wanted to sell
this iron to somebody else, and asked us if we would give
him a receipt showing that he had paid for it, that he
might show to anybody interested in the purchase of it.
I gave him this receipt showing that he had paid for it.

After that Mr. Baker came in and asked me about the scrap iron, if Richmond owned it. I told him that he did and that he had about 40 days within which to remove it; if he bought it that he would have to remove it within that time or it would revert to the Company. x x x He (Baker) said that he wanted to buy it, and we discussed the time that he had. I told Mr. Baker at the time that there was about 40 days in which to get it off of the property. x x We sold the property a second time after we had sold it to Richmond and Goldstein, because their time had expired over 60 days and the property belonged to us".

The capital of the Company is $200,000 and witness owns $2,000 of the stock. Ben Boudreaux, also for the defendant, testified that he was employed by the Belle Chasse Land Company as agent; that he was the salesman of the junk; that Goldstein came in one day and offered $150 for the junk, and they finally agreed to sell it for $200; that he had a memorandum of the sale which he had made with Mr.Braswell; (the Court then told him he could not use it); that

"it was distinctly understood that he was to remove it within 60 days";

Mr.Braswell ~~said~~ *told him that*

"it was old scrap iron and he wanted to get rid of it, and that he wanted it removed within 60 days, that is as far as he remembered; Goldstein gave him $50, and he agreed to remove it in 60 days; and "if he didn't remove it, it would revert back to Mr.Braswell, the Belle-Chasse Land Company".

J. D.Barksdale is the President of the defendant Company; he was asked if Mr.Braswell had ever consulted him about an extension on a sale of scrap iron; on objection to the question it was ruled out; he said their purpose was to sell the scrap iron in order to clean up the land and offer it for sale in connection with a campaign they were getting up; a man representing himself as Mr. Richmond came into their office and asked for an extension, and witness talked it over with Mr.Braswell; six months later he directed the sale of the scrap iron because neither Goldstein nor Richmond

36

had removed it.

Mr. Boudreaux testified that it is customary to allow 30 days for removal of scrap iron; that he had handled considerable transactions of that kind

"both up and down the riveer and on both sides".

Joseph Melan, a junk dealter, was asked:

"What is the custom as to the removal of scrap iron that you have bought"?

On objection, the question was ruled out.

On behalf of the plaintiff Max Richmond testified as follows:

Q. Was any time limit placed by you on the removal of that stuff from the place?

A. No, no time limit at all.

Q. Never specified?

A. Never.

Q. Was anything said to Baker in your presence by Braswell about the time limit in which the stuff was to be removed,

A. Mr. Baker and this gentleman here was speaking together at that time, what they said amongst them I don't know. x x x

Q. Do you remember if this man Braswell said to Baker that this iron must be removed within sixty days?

A. No, I don't see how he could have told Baker that when he never told me and Goldstein that".

It does not appear what occupation Richmond pursued, or whether he had any occupation at all.

The plaintiff, Baker, is an itinerant junk-dealer for the last ten years, he describes himself as follows:

"I am a local buyer, I don't have any place. I just buy and sell".

He continued:

"Finally went to the Belle Chasse Company office and the manager gave me a clear receipt. He said everything is O.K. I asked him if he is got any limit and how long he had to keep the scrap iron there. He said, there is

·37·

not limit at all, you can keep it as long as you want".

x x x

Q. "Was anything said to you at that time as to when the iron should be removed?

A. He give me that letter when I told him I wanted him to put down in that letter there is no limit when I remove the iron. I told him I could not re.ove it so quick. He said, "you don't need, you go ahead and remove the iron any time you want".

Q. Were you notified at the time that letter was delivered to you, that there was a time limit in which this scrap iron was to be removed?

A. No, sir."

The recital of this testimony shows conclusively that the preponderance is with the defendant. It might be said that it is immaterial whether any time limit entered into the contract between Richmond and the Company, as it could not affect Baker. That might be; but at the same time, it might serve to corroborate the testimony that there was also a time limit ~~to the~~ Baker ~~contract~~. Richmond stands alone in saying that he was not limited as to time. He is contradicted by Braswell, Boudreaux, and Parksdale. Therefore, we must assume that there was a limit as to Richmond.

Baker also stands alone in his testimony. For while he states that he asked Braswell whether there was a time limit and that the subject was discussed in the conversation with him, Richmond swears he heard nothing of the kind. If a time limit was spoken of and Richmond did not hear it, then it is possible that Braswell did limit the time notwithstanding what Richmond says. So that the testimony of Baker is pitted against that of Braswell and Boudreaux and of Richmond. Perhaps, if it had been admitted in evidence , tho memorandum of the sale which Boudreaux and Braswell had made together, would have settled the controversy.

We are,therefore,constrained to come to the conclusion that there was a time limit as to both Richmond and Baker and that, at the time the plaintiff visited the defendant's office, he was informed that the iron had to be removed within forty days.

38

We feel safe in coming to this conclusion by the additional fact that there is nothing certain in plaintiff's case except the sale to Goldstein for $200; the rest is shrouded in doubt.

Richmond does not remember how much he paid to Goldstein. Yet it appears by a receipt offered in evidence by him, but not in the record, that he paid $195.77.

The transaction between Richmond and Baker is not established with certainty.

Baker testified first, and he said:

Q. How much cash did you pay for the scrap iron that you bought from Max Richmond?

A. I don't remember how much.

Q. How much in a check did you pay him?

A. I don't remember, I paid him some in check and some cash.

Q. On what bank was the check?

A. Citizens.

Q. Will you produce that cancelled check that you paid to him.

A. No, I can't.

Q. Why?

A. I don't keep track of those checks, I destroy those checks.

Q. When did you destroy them?

A. Always, as soon as I get them from the Bank.

The Court. As soon as you have your book balanced?

A. Yes.

Richmond followed:

As stated by defendant in argument and in his brief, and not denied, before recess he testified as follows:

After the conversation with Braswell, Baker "come outside and gave me a check for the iron".

After recess his testimony was as follows:

Q. How were you paid by Baker?

A. It was some in cash and some in a check.

Q. I thought you said by a check?

39

A.  I remember, I did ask him for cash, and he paid me
what he did have in cash and the balance in a check.

Q.  How much in cash?

A.  I don't remember.

Q.  On what bank was the check?

A.  I can't remember.

Q.  What did you do with the check?

A.  I cashed it.

Q.  Where?

A.  I don't remember where I cashed it.

It is not explained where, and when, Baker wrote that
check, whether before or after leaving Braswell's office.

The quantity of scrap iron on the Plantation at the time
of the sale by the defendant to Goldstein appears nowhere.
Richmond being examined says:

Q.  Do you know how many tons of scrap iron there was
down there when you bought it?

A.  I can about tell you about how many boilers were
there.  On the place was four.  Two in a ditch where they cut
the sides out so the water could drain through it; two
of the same kind of boilers as long as from where I am
sitting to that first seat.

Q.  Do you know how many tons a boiler weighs?

A.  Goldstein an old experienced man said they weighed
5 tons each.

Q.  Mr. Richmond did you see any sugar tanks there?

A.  Yes.

Q.  Do you know how many sugar tanks were there?

A.  To tell you exactly now, I can't say exactly, but
I know there was about five and six sugar tanks, I believe.

Q.  Not less than five nor more than six?

A.  No, I don't think.

Q.  There was a large fly wheel, groove wheels, what they
call a balancing wheel?

A.  They had so much junk scattered around there that I
just can't remember".

Q.  How much did you move off the place?

40

A. That was before I ever made the deal with Mr.Baker.

Q. How much did you move off before you made the deal with Mr. Baker?

A. Eighteen tons.

Plaintiff testified:

"Mr. Richmond told me he was drafted to go to the army, he has some scrap iron and wants to sell it, and I went with him to Belle Chasse. We estimated the scrap from 65 to 75 tons.

Q. In what condition was the iron when you saw it?

A. There was a lot of the scrap that was cut, carried off and broken up in small pieces, I think two boilers was left".

The Court:

Was the boilers cut into small pieces?

A. One or two boilers was not cut up.

Joseph Melan testified on behalf of defendant. He lived on Belle Chasse for three years and left there only three months ago; lived there in 1917 and 1918; has been a junk dealer for ten years; thinks there were about 20 tons of junk on the place; was never employed by the Company.

Boudreaux and Braswell testified, and it is not contradicted, that the defendant, on December 27th, 1918, sold the junk to Wilkom with 30 days to remove it; that Wilkom on same day sold to Glazer, in the scrap iron business, who removed 42,900 pounds or 21 tons and a half according to railroad weight tickets, and abandoned the balance on the plantation. Melan testified that he told Baker that the junk had been removed.

Upon receipt of this information Baker testified as to what he did , as follows:

Q. And so that person told you that some of the iron had been removed?

A. He said, all had been removed.

Q. Of your own knowledge you don't know whether any of it had been removed?

A. Yes, I went and looked for myself.

Q. You don't know then how much of the scrap iron that

you saw when you purchased it that is still on the land; to you?

A. I saw nothing but a smoke stack. Some pieces lying around. I didn't pay any attention. If there was any thing laying around it is not valuable.

Q. Very poor?

A. Yes, sir.

This evidence establishes beyond question, that according to actual weights, and not by guess-work, the junk removed by Glazer contained only 21 tons and a half tons, and not 65 to 75 tons, and that the balance remaining was "not valuable" and "Very poor", so much so, that Glazer abandoned it, and that it is still there. There is no suggestion and no evidence that between the time Baker says he bought of Richmond, on September 18 to the time Glazer, on December 27th sold, any one had removed a particle of that junk.

After having multiplied the quantity of junk it was natural for the plaintiff to inflate its value to $1705. The first sale by the defendant to Goldstein was for $200; the second sale by Goldstein to Richmond was for $195, and that consisted of the 18 tons removed by Richmond and of the quantity remaining; the third sale from Richmond to Baker, assuming that it was a sale, was for $350; the fourth sale by the defendant to Wilkom was for $165, and the fifth sale by Wilkom to Glazer was for $225, or about $10 a ton; and Melan offered $85 for it.

In the face of this testimony it is hardly worth noticing the testimony of plaintiff's witness, in the junk and bottle business, that he had purchased this junk from Baker in February 1918 to be delivered f. o.b. cars in April for $24 a ton. He had never seen the junk and according to his own testimony, the value of scrap iron depends upon its kind. It is also remarkable that while plaintiff alleges that he purchased this junk in September, he never exercised any act of ownership, and never pretended to have found a buyer for it, until he was informed that the defendant had sold it.

The plaintiff never notified the defendant that he had purchased the junk; it was only after he had been told that it had

42

been removed that he called on the defendant. He says:

Q. "What did you do when you found that some of the iron had been removed?

A. I went to the Belle Chasse office and asked them about it.

Q. Who did you see?

A. That gentelman right here, Mr. Braswell.

Q. What did he tell you?

A. They have to sell that place and have to have room there.

Melan testifies:

"I am the man that brought Baker to the office.

Q. Who did you introduce him to?

A. Mr.Braswell. I told him there is the gentleman.

Q. What did Mr. Baker say to Mr.Braswell?

A. He says, Why Mr. Braswell, why you sell my iron? He says, your iron? Baker says: Yes. Braswell says: I don't know anything about it. Baker says: I am going to sue you.

Q. That was the whole conversation that took place between Baker and Braswell.

A. Yes.

It could not have been the duty of defendant under any circumstances to have called upon Baker, or to have notified him to remove the junk or they would sell it, because Baker never informed them that he had acquired the junk and they did not know it. Even if they had known it, Baker had no place of business, and they did not know where to find him. As far as they knew, Richmond was the owner of the junk, and they knew that he had removed a car load of it. They knew that he had 60 days to remove what he wanted, and what he did not remove within that time, they had reason to believe he had abandoned as not worth taking away. They sold to Richmond on June 28th, 1917; they waited until December 27th, 1917, a period of seven months before they sold to Wilkom; independently of any time limit they could not have been expected to wait longer and considering the time-limit, they were more than indulgent. They had no other remedy than to sell to some one else, and thus have

the junk removed.

But we are not convinced that the defendants made it clear to Richmond or to Baker that if they failed to remove the junk that they would not only forfeit their right to the junk, but also to the price which they had paid. That the defendants had a right to rescind the contract if it was not executed within the time specified, is clear to us. But it does not follow that they would have the right to retain the junk and the price too. We decided on October 25th last in a case against Pailet that it was universal law that where a vendor rescinded a sale it was his duty to reimburse the consideration he had received. It is also the duty of the vendee to account for the revenues of the thing sold. In the present case the defendants were paid $200 by Goldstein. But Richmond, his transferee, sold eighteen tons at $19 a ton, less $1 a ton for preparing it, leaving him not $324, or $124 more than he had paid; therefore the defendants owe him nothing, and nothing to his transferee Baker.

C. C., 1901 (1895):

"Agreements legally entered into have the effect of laws on those who have formed them". C.C., 1945; 24 A., 21,235.

"Whenever the vendee refuses to comply with the stipulation to be performed by him the vendor is obliged to wait no longer, but may at once demand a dissolution of the contract". 14 A, 341.

"When movables have been sold with an express resolutory clause, it is not necessary for the vendor to make a summons upon the purchaser; the resolution takes place ipso facto at the expiration of the delay agreed upon". 43 Dalloz Inr. Gen. Vente p 306, 1269; 2 Trop Vente §667; 1 Duvergier p 562 §461; 24 Laurent 377, 397.

The assignee of a vendee can only acquire such rights as he had and takes the property cum onere. 28 A., 598; 23 A., 757.

"The debtor (vendee) could only cede the rights he had, and in the condition they were at the time. What was conditional and defeasible in his hands, did not become absolute and indefeasible in the hands of his creditors". 8 La,, 83.

Stevenson vs Brown, 32 A., 461, was a suit against a ven-

dee and _his_ vendee for the resolution of a sale for non payment
of price. The defense of the second vendee was want of recorda-
tion of the vendor's privilege as notice to third party.

The Court said on p 463:

"The fact that the vendor has lost, or not preserved,
his vendor's lien, or mortgage, presents no sort of ob-
stacle to the exercise of this right of resolution. When
such an action is brought by the vendor, he does not use
to annul the contract made with his vendee, but to enforce
it. The case does not differ in principle from that where
any other event is made a condition of resolution. Thus,
if I sell you my house for $10,000 and stipulate in the
act that if a certain ship returns from the Indies the
property shall return to me, and the sale be without ef-
fect, a suit by me alleging the return of the ship and
the consequent avoidance of the contract, will be a suit
to enforce one of the stipulations of the contract. Where-
ever a right or title is by contract express or implied,
made to depend upon a condition, that right or title is
defeasible. Its holder can confer no greater right than
he has himself, and, consequently, all alienations and
encumbrances granted by him vanish when the conditions
happens. The vendors action is one in revendication of
the thing. One purchasing property must look to his ti-
tles. For the present case that title informed Wade
that his vendor Brown had agreed that in the event of
failure to pay the notes given for the price, the property
was to revert to Stevenson. It informed him that Brown's
title was defeasible, and dependent for its continuance
upon the happening of a condition. One who acquires a
title with such stipulations in it, takes it subject
thereto". See also 31 A., 627 (634, 635); 12 A., 699
(702); 43 Dalloz Vente § 1365.

Where it appears that the vendee is indebted to the ven-
dor for rents and revenues to an amount greater than the price
paid by him for the property, no tender of the price on the part
of the vendor is required before the institution of the suit".

■

14 A., 598 (599); 43 A., 534; 114 La., 62 (69); 119 La., 795 (860). *124 La 854(858) — 117 La 1024—*

The judgment of the lower Court is therefore reversed and set aside, and it is now ordered that there be judgment in favor of the defendants rejecting plaintiff's demand at his cost.

November 8th, 1920.

*Dinkelspiel J. dissents, and thinks there should be judgment for plaintiff for $165.00, the price for which defendant sold the balance of the funk to Willkom.*